DMP/JMH/NJM/NCG
F. #2015R00517

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -
                                     Docket No. <u>19-CR-402 (NGG)</u>

RUSLAN ASAINOV,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X


<u>THE GOVERNMENT'S SENTENCING MEMORANDUM</u>



                                          BREON PEACE
                                          United States Attorney
                                          Eastern District of New York
                                          271 Cadman Plaza East
                                          Brooklyn, New York 11201



Douglas M. Pravda
J. Matthew Haggans
Nicholas J. Moscow
Nina C. Gupta
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

BACKGROUND .................................................................................................... 2

I.   THE ISLAMIC STATE OF IRAQ AND AL-SHAM ........................................ 2

II.  THE DEFENDANT'S MATERIAL SUPPORT TO ISIS.................................. 4

    A.  The Defendant's Background....................................................................... 4

    B.  Late 2013-Early 2014: The Defendant Traveled to Syria and Joined ISIS.................. 4

    C.  Mid-2014: The Defendant Swore Allegiance to ISIS and Received Sniper Training .. 6

    D.  The Defendant Fought in Numerous Battles on Behalf of ISIS................................ 7

    E.  The Defendant Became a Sniper-Trainer and Fought in Raqqa ................................ 10

    F.  The Defendant Fought in Baghouz Until His Capture in March 2019 ...................... 12

    G.  The Defendant Has Continued to Show His Ongoing Allegiance to ISIS and Desire to Fight for ISIS If Released.......................................................................... 13

PROCEDURAL HISTORY ................................................................................... 15

I.   PRETRIAL PROCEEDINGS ......................................................................... 15

II.  TRIAL AND CONVICTION .......................................................................... 15

LEGAL FRAMEWORK ........................................................................................ 17

I.   THE SENTENCING FRAMEWORK AND APPLICABLE GUIDELINES CALCULATIONS .......................................................................................... 17

II.  THE 3553(A) SENTENCING FACTORS ..................................................... 19

ARGUMENT.......................................................................................................... 21

I.   THE COURT SHOULD IMPOSE THE MAXIMUM SENTENCE .............. 21

    A.  The Nature and Seriousness of the Defendant's Egregious Conduct Requires the Maximum Sentence ................................................................................... 21

    B.  The Maximum Sentence Is Appropriate to Deter Others and to Protect the Public from Further Crimes of the Defendant ................................................. 22

C.   The Defendant's History and Characteristics Also Support the Maximum Possible Sentence .................................................................................................... 23

D.   Comparable Sentences .......................................................................................... 25

E.   Supervised Release ............................................................................................... 26

F.   Financial Aspects of Sentencing .......................................................................... 27

CONCLUSION .......................................................................................................................... 28

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in advance of the sentencing of Ruslan Asainov ("Asainov" or "the defendant"), currently scheduled for October 17, 2023, at 2:00 p.m.

The defendant was a warrior, sniper, and sniper-trainer for ISIS for approximately five years, between December 2013 and his capture and subsequent removal in custody from Syria in mid-2019. As a warfighter for ISIS over several years, the defendant gradually moved up the ranks of ISIS combat leadership, so much so that other significant members of ISIS referred to him as an "emir," or chief. The defendant also trained other ISIS fighters in the use of weapons and attempted to recruit others to travel from the United States to Syria to fight for ISIS. The defendant acted as a force multiplier for ISIS's bloody, brutal campaign of global jihad by providing to ISIS personnel, including himself and the people he trained to become snipers; his training, expert advice and assistance as a sniper-trainer; and weapons and explosives.

The defendant was a violent terrorist for a foreign terrorist organization at the height of that organization's power. He and his trainees were responsible for the deaths of multiple people in Syria. As he said in his own words, "My students may be killed and they did kill, and I taught them . . . I was an Islamic State fighter. I admit what I did." Trial Tr. 1446.

The defendant should spend the rest of his life in federal prison.

1

BACKGROUND

I.      THE ISLAMIC STATE OF IRAQ AND AL-SHAM

As proven at trial, ISIS traces its history back to 1999 in Afghanistan, when Abu Musab al-Zarqawi created a predecessor organization, Jama'at al-Tawhid wa'l Jihad.  See Tr. 1079; PSR ¶ 8.[1]  By October 2004, ISIS—at the time operating under the moniker "al-Qaeda in Iraq"—was designated by the United States Secretary of State as a foreign terrorist organization ("FTO").  Id.; GX 1000A-1000E (reflecting periodic updates to the FTO designation to track changes in ISIS's self-nomenclature).

By 2012 and 2013, ISIS established territorial control in large parts of Syria, and began to expand its dominions in Iraq, ultimately conquering a large portion of that country as well.  See Tr. 2192-93.  ISIS became so entrenched in the region, in fact, that by June 29, 2014, its leader, Abu-Bakr al-Baghdadi, declared ISIS to be the Caliphate for the entire global Muslim community from a mosque in Mosul, Iraq, shortly after ISIS conquered that city.  See Tr. 2194-85; PSR ¶ 11; GX 3 (photograph of al-Baghdadi delivering said speech).  At this time, ISIS also deleted the geographic limitations from its name—"Iraq and al-Sham"—manifesting its intention to create a state for all Muslims worldwide.  See Tr. 2196.  At its height, ISIS controlled territory in Syria and Iraq with approximately ten to twelve million inhabitants.  See Tr. 2229.

In the period from 2013 to 2019, ISIS disseminated propaganda beseeching Muslims to travel to ISIS territory—to make *hijra*—to join the so-called Caliphate.  Tr. 1213-

---

[1]      Citations to "Tr." are to the trial transcript; citations to "GX" are to government trial exhibits; and citations to "PSR" are to the Presentence Investigation Report dated July 20, 2023.

14; GX 1002A (*Dabiq* magazine from 2014 titled "A Call to Hijrah").  Over the relevant period, approximately 40,000 foreign fighters joined ISIS.  See Tr. 2215.  The vast majority of foreign fighters entered ISIS territory by crossing the border from Turkey into Syria.  Id.

By late 2014, after other countries made travel to ISIS territory more difficult, ISIS began to exhort potential *muhajireen* (i.e., travelers making *hijra* to ISIS territory) to conduct attacks in their own countries if they were unable to travel.  See Tr. 2222; PSR ¶ 11. During the relevant period of 2013 to 2019, ISIS was the deadliest FTO in the world, and responsible for the most terrorist attacks in that same period.  See Tr. 2249-50.

II.    THE DEFENDANT'S MATERIAL SUPPORT TO ISIS

   A.    The Defendant's Background

   The defendant, a native of Kazakhstan, became a naturalized United States citizen in 2006.  GX 318; PSR ¶ 12.   Prior to joining ISIS, the defendant resided in Brooklyn, New York, with his former wife and their daughter, who was born in 2011.  PSR ¶ 12; Tr. 801-02, 806-07.  The defendant worked as a brokerage trader.  Tr. 798.

   In 2009, the defendant converted to the Islamic faith and became a practicing Muslim.  PSR ¶ 12.  The defendant also began taking classes in Arabic and learned to read, speak, and understand Arabic.  Tr. 814.  Over the next several years, the defendant began consuming radical and extremist Islamic content online.  PSR ¶ 12.  At the same time, he became stricter in his practice of Islam; he grew out his facial hair, changed his clothing to Arabic dresses, forbade his wife from putting up a Christmas tree, and threw away his daughter's toys.  Tr. 807-08, 817-818.  He also quit his job as a trader because he viewed the job as being against his religion.  Tr. 808.  After the defendant quit his job, he primarily stayed at home and took care of his daughter.  Tr. 813.  The defendant also began attending classes at the Borough of Manhattan Community College, where he studied nursing.  Tr. 813-814.

   B.    Late 2013-Early 2014: The Defendant Traveled to Syria and Joined ISIS

   On December 24, 2013, the defendant abandoned his former wife and their child in Brooklyn and boarded a one-way flight from John F. Kennedy International ("JFK") Airport in Queens, New York, to Istanbul, Turkey, arriving in Istanbul on December 25, 2013.  PSR ¶¶ 13, 14.  The defendant and his co-conspirator, Mirsad Kandic, had previously coordinated

their travel, arriving in Istanbul on the same day.  PSR ¶ 14;[2] GX 406.  Shortly thereafter, accompanied by Kandic, the defendant entered Syria and, by January 2014, had joined ISIS in the area of Haritan, Syria.  Tr. 1385.  The defendant credited Kandic with assisting him in joining ISIS, stating in a later message to a government witness that Kandic "is the brother who made a road for me to jihad" and that "with him [Asainov] . . . entered Sham [i.e., Syria]." GX 825.

Once in Syria, the defendant began executing ISIS's objectives.  Asainov, by his own admission, spent approximately one month in Haritan, where he learned how to use a Kalashnikov rifle and was sent to perform "*ribat*," which he described as a form of guard duty, to prevent any advances by the Free Syrian Army (a force opposed to ISIS).  Tr. 1385.  As Asainov told a government witness, here, he felt that he had arrived in the Islamic State.  Id.

From Haritan, Asainov traveled to Azaz, Syria, where he stayed approximately two to three weeks.  Tr. 1386.  In Azaz he was given a Kalashnikov rifle and took shifts guarding a building.  Id.  Reflecting on his new combat role, Asainov stated to a government witness, "here, you don't really know if you are going to live tomorrow."  GX 814, 814T. After breaking through Free Syrian Army lines, ISIS arrived in Azaz in a massive convoy.  Tr. 1386.  Asainov said that he started to "truly" feel he was a part of the Islamic State.  Id.  From Azaz, Asainov traveled to Manbij, Syria, where he lived in dorms with four different ISIS

_____

[2]    In May 2022, Kandic was convicted, following a jury trial, of conspiracy to provide material support to a foreign terrorist organization and five counts of provision and attempted provision of material support to a foreign terrorist organization.  See ECF No. 321, United States v. Kandic, No. 17-CR-449 (NGG) (E.D.N.Y.).  In July 2023, Kandic was sentenced to life imprisonment on two counts, to run concurrently, and 240 months on each of the four other counts, to run concurrently.  Kandic, ECF No. 360.

*katibas*, or military units.  Tr. 1387.  There, he chose his *kunya*, or name in the Islamic State, Suleiman al-Amriki.  Tr. 1388.  He later used a different *kunya*, Suleiman al-Kazakhi because his status as an American (i.e., "al-Amriki") was drawing unwanted attention.  Id.

C.  Mid-2014: The Defendant Swore Allegiance to ISIS and Received Sniper Training

1.  The Defendant Swore *Bay'at*, or Allegiance, to ISIS

In mid-2014, Asainov traveled to Tabqa, Syria.  Tr. 1388-89.  On June 29, 2014, Abu Bakr al-Baghdadi, ISIS's leader, or "Caliph" at the time, declared the formation of the Islamic State from Mosul, Iraq.  PSR ¶ 16.  Around that time, Asainov swore *bay'at*, or allegiance, to ISIS and to al-Baghdadi specifically.  Id.  Asainov swore his oath in the presence of Abu Omar al-Shishani, the leader of an organization that was absorbed into ISIS.  Id. Shishani later became a prominent ISIS leader and warrior in charge of ISIS's defense in northern Syria.  Id.  He also became a member of the Shura council, which was essentially ISIS's cabinet, and was Abu Bakr al-Baghdadi's second-in-command.  Id.; Tr. 1181.  Shishani was later killed in battle.  PSR ¶ 16.

After Asainov pledged *bay'at*, he was assigned to the *Sabri katiba*, and he began receiving a salary as a member of ISIS.  Tr. 1389, 1412.  He received two weeks of training on the use of automatic rifles, machine guns, and rocket-propelled grenades.  Tr. 1389.  Prior to this, Asainov had never been in the military or had any weapons training.  Id.  Around this time, Asainov burned his United States passport, cementing his break from the United States and his allegiance to ISIS.  Id.

While in Tabqa, the defendant married a Russian woman from Dagestan ("Second Spouse").  Tr. 1412.  They later had three children: a son born in August 2015, a

second son born in approximately late November 2016, and a third child who was born after the defendant was apprehended and removed from Syria to the United States in custody to face the charges at issue in this case.  Id.

      2.   Over a Period of Three Months, the Defendant Received Training to Become a Sniper

While in Tabqa, Asainov volunteered to participate in a sniper training course that lasted approximately three months.  Tr. 1413.  During this time, Asainov learned optics, ballistics, and rifle mechanics, and he had to pass a math exam.  Id.  He trained on an M-16 rifle with night vision optics and various scopes.  Tr. 1414.

      D.   The Defendant Fought in Numerous Battles on Behalf of ISIS

Following his sniper training course, Asainov fought in a 24-hour battle at Tabqa airport.  Tr. 1414.  He was armed with a rifle with night vision optics, which he used to target enemies in the surrounding area.  Id.  An expert witness, Professor Lorenzo Vidino, testified that the battle at Tabqa airport was particularly important because the airport was one of the last remnants of the Syrian military in the Raqqa province of Syria, and the battle led to ISIS's control of that region.  Tr. 2242.  ISIS's victory in that crucial battle was glorified in an ISIS publication, *Dabiq* magazine.  GX 1002-A.

While he was at Tabqa, the defendant sent a government witness photographs of himself in camouflage clothing holding a M4 rifle.  GX 1B, 1C.

 

Asainov also admitted in a post-arrest statement that he fought against Kurdish Syrian Democratic forces in a ten-day battle in Kobani, Syria, where he was responsible for choosing the tactical placement of snipers.  Tr. 1441.  The defendant wrote to a government witness that the battle at "Kobani was a good lesson and trial for all of us," noting that "we all were there for some time" and that many of his fellow fighters were killed: "Alot [sic] of my friends stayed there under the buildings[.]"  GX 823.  An expert witness, Professor Daniel Milton of the United States Military Academy at West Point, testified that the battle at Kobani between ISIS and Kurdish forces involved urban combat in a densely packed city that resulted in the death of a few thousand people.  Tr. 1697-99.  Like Tabqa, the battle at Kobani was glorified in ISIS publications.  GX 1003A.

Additionally, Asainov admitted that he fought in a battle in Deir ez-Zor, Syria, both in his post-arrest statement and to a government witness.  Tr. 1442; GX 823.  There,

Asainov stated that he was shot through the right shoulder during a battle, and it took him approximately one year to recover from the wound.  Tr. 1442.  Throughout his time in Syria, Asainov also stated that he fought in battles in Tadmur and al Qaryatayn, Syria.  Tr. 1421.

In 2014 and parts of 2015, Asainov remained in intermittent contact with his former spouse and confirmed in his communications to her that he was fighting in battles on behalf of ISIS.  PSR ¶ 17.  He sent her a photograph of three corpses, one of whom was wearing a uniform bearing a patch with Arabic script that translated to "Islamic State of Iraq and al-Sham."  Id.; GX 603.  Regarding the photograph, Asainov stated, "These young guys are my friends who died in the last battle, which I participated in."  GX 617T.



Asainov later sent his former spouse threatening voice memos, confirming his membership in ISIS as a fighter:

> Have you hear of Islamic State?  Right?  I-S-I-S?  Right? . . .
> That's where I am located.  And I am one of its fighters.  Got it?
> Islamic state, where these stinky "kafir," whose airplane is flying
> over right now, who are saying that we are the most atrocious

terrorist organization in the world that ever existed.  Got it?  So I am basically one of its members.  Got it? Right now.  Right?  So don't talk to me this way, bitch, and a dumbass.  Because I will take everything away from you.  Got it? . . . And trust me if I want to take it away from you, got it, these scumbags—not your MI-6, not your FBI, nobody will help you there.  Got it? . . . Think about what I am saying.  Think deeply about it, bitch. . . . Now, walk around in fear, bitch, because they can always come from around a corner.

GX 633T; GX 634T.

The defendant also remained in contact with Kandic during his time in Syria. GX 421-425.  In a communication in February 2015, Kandic congratulated Asainov on getting married and finishing his "dream course," i.e., the defendant's sniper-training course.  GX 422. Asainov relied on Kandic to send him weapons and personnel.  For example, Asainov requested and secured a night vision scope from Kandic, which Kandic procured from a man from South Africa, and sent to Asainov in Syria, as confirmed by a government witness who formerly lived with Kandic and knew of Asainov as the "sniper emir."  Tr. 1206-07. Additionally, Asainov requested additional personnel and specifically "Russian-speaking brothers" to join him in Syria, and Kandic in fact sent fighters to Asainov.  GX 1332BI.

E.    The Defendant Became a Sniper-Trainer and Fought in Raqqa

Following the battle at Tabqa, the defendant joined a new *katiba* specifically for snipers and sniper-trainers called *Sa'ad ibn Abi Waqqas*.  Tr. 1415.  Sometime after joining this *katiba*, the defendant replaced a sniper-instructor who had been killed in action.  Tr. 1416. Asainov remained a sniper-trainer in *Sa'ad ibn Abi Waqqas* for approximately two to three years.  Id.  The defendant went on to join the *al Qadisiyah katiba*, in which he fought as a sniper for five to six months.  Tr. 1420.  The defendant later returned to *Sa'ad ibn Abi Waqqas katiba* and created his own sniper training program to teach all the Russian-speaking students.

Tr. 1423.  His course lasted approximately two-and-a-half to three months for each class of aspiring sniper students.  Tr. 1424.  As part of the training program, the defendant used a combination of audio-visual presentations, including videos, at least one of which was produced by the U.S. military.  Id.  He also employed field drills, such as firing at targets without revealing firing positions and establishing concealed firing positions.  Id.  At trial, a former U.S. Navy Sea, Air, and Land ("SEAL") scout sniper testified that the defendant's description of his sniper training course was consistent with what the former U.S. Navy SEAL would expect to be taught in a sniper training course.  PSR ¶ 18.

Eventually, the Syrian Democratic Forces surrounded Tabqa, and the defendant fled Tabqa for Raqqa, Syria.  Tr. 1425.  There, for approximately five months, from the spring of 2017 to October 2017, he taught a sniper training course to replace snipers who were killed in battle.  Id.  Asainov felt pride in his students when he heard they did well in combat as a result of their training.  Tr. 1426.

In addition to training others, the defendant continued to fight ISIS's opponents in Raqqa.  Id.  He informed a government witness that at one point, he fought from a basement due to bombardment by U.S. troops.  Tr. 1427.  While he was in Raqqa, the defendant remained in contact with Kandic and admitted that he was in Raqqa at the time.  PSR ¶ 21.  On June 24, 2017, for example, Asainov sent Kandic Telegram voice memos asking Kandic to send money to help him get his family out of Raqqa.  Id.  In two of the recordings, large explosions are plainly audible in the background, explosions on which Asainov comments: "You hear, you hear they bombing, boom, right now [laughter] . . . Heard that?  That's *kuffar* [i.e., infidels], *akhy* [i.e., brother]."  Id.

11

Asainov stayed in Raqqa until, as he described it to a government witness, "the last day." Tr. 1427.  At that point, in October 2017, ISIS had a great number of casualties, including 37 ISIS leaders in one day, and ISIS was pinned down to an 800-meter area.  Id. Asainov escaped Raqqa in a truck with 30 to 40 other ISIS fighters.  Id.

Overall, the defendant was a sniper-trainer for ISIS for two to three years, and during that time he trained approximately six to seven groups or classes of aspiring ISIS snipers.  PSR ¶ 19.  Each class or group had approximately 20 students, 12 to 14 of whom completed the course successfully.  PSR ¶ 19.  Therefore, nearly 100 of the defendant's students completed his training course and became ISIS snipers.  PSR ¶ 19.  When asked by law enforcement how many confirmed kills he had, the defendant said he could not recall.  Tr. 1445.  Regarding his students, the defendant stated: "My students may be killed and they did kill, and I taught them."  Tr. 1446.

F.    The Defendant Fought in Baghouz Until His Capture in March 2019

After Raqqa, the defendant eventually made his way to Baghouz, Syria.  Tr. 1428.  The defendant fought on behalf of ISIS for its last stand until he was captured on March 24, 2019.  Tr. 1429.  Before his capture, he discarded his rifle and burned his cell phone.  Tr. 1430.  At the time he burned his cell phone, the defendant told law enforcement that he knew the FBI was interested in him.  PSR ¶ 23.  After his capture, the defendant was held at a prison controlled by the Syrian Democratic Forces.  Tr. 1430.  He stated in 2019 that if he was released, he would return to fight for ISIS.  Tr. 1431.

Following his capture, Syrian Democratic Forces transferred custody of the defendant in Syria to FBI personnel, and he was thereafter transported by plane to JFK Airport in Queens, New York, within the Eastern District of New York.  Tr. 1363-64.

G.      The Defendant Has Continued to Show His Ongoing Allegiance to ISIS and Desire to Fight for ISIS If Released

Following the defendant's arrest in this case, the defendant has continued to manifest his allegiance to ISIS.  On September 11, 2019, the defendant was arraigned on the indictment in this case, and during that proceeding, Your Honor inquired as to the defendant's citizenship.  PSR ¶ 24.  The government noted (accurately): "He is a United States citizen, Your Honor," at which time the defendant interjected, "No, I'm Islamic state citizen.  Not a United States citizen."  PSR ¶ 24.

The defendant has expressed a similar allegiance to ISIS in recorded phone calls with his mother while he has been detained in connection with this case.  In a call on September 12, 2019, one day after his arraignment, he told his mother, "I am a *Mujahid* [i.e., holy warrior] on Allah's way . . . *Mujahid* is the one who is fighting on Allah's way."  PSR ¶ 26.  Similarly, on July 9, 2020, the defendant stated, "Allah commanded me, commanded me to fight and I fought, right? . . . I haven't done anything wrong.  These pigs are the guilty ones."  PSR ¶ 26.  Two weeks later, Asainov stated, "You do not even know why you gave birth to me, Mama.  You gave birth to me in order for me to fight in Allah's ways.  I am missing *Jihad* [i.e., holy war] a lot, Mama . . . .  You don't understand the sweetness of this, this thing.  When it enters your heart . . . I will be fighting until the end . . . Until I meet Allah."  PSR ¶ 26.

In  September  2020,  while  Asainov  was  detained  at  the  Metropolitan Correctional Center, Bureau of Prisons ("BOP") personnel retrieved from his cell a hand drawn ISIS flag, which he had mounted on the wall of his cell above his desk.  PSR ¶ 25.  When BOP personnel retrieved the flag, the defendant stated that the flag was religious and had to do with his religion.  PSR ¶ 25.

During pretrial and trial proceedings, Asainov has continued to express that he does not recognize this Court or the legitimacy of the prosecution against him. He did not stand for the jury or for Your Honor throughout trial, and on February 2, 2023, he refused to respond to questions from the Court, stating, "I'm not part of this process. I give no authority to anybody, except for the authority I have from me to Allah. That's all I'm going to say . . . My body is present here. I'm not present here." PSR ¶ 27.

The defendant also made voluntary statements to a Deputy U.S. Marshal who transported him to and from the Metropolitan Detention Center ("MDC") and the courthouse during trial. PSR ¶ 28. On January 23, 2023, the defendant stated that ISIS would rise again and that the "West" would fall. PSR ¶ 28.

<u>PROCEDURAL HISTORY</u>

I.     <u>PRETRIAL PROCEEDINGS</u>

On July 2, 2018, the defendant was charged in a sealed complaint with one count of providing and attempting to provide material support to ISIS in violation of 18 U.S.C. § 2339B.  <u>See</u> Complaint, ECF No. 1.  On September 3, 2019, a grand jury sitting in the Eastern District of New York returned an indictment ("the Indictment") charging the defendant with conspiring to provide material support to ISIS including property, services and personnel, including himself and others, in violation of 18 U.S.C. § 2339B (Count One).  <u>See</u> Indictment, ECF No. 15.  The Indictment also charged two substantive violations of 18 U.S.C. § 2339B, in the forms of: personnel, including the defendant and others (Count Two); and property and services, including training, expert advice and assistance, and weapons and explosives (Count Three). Counts One and Three charged that the defendant's offense resulted in the death of one or more persons.  The Indictment also charged the defendant with receiving military-type training from and on behalf of ISIS, in violation of 18 U.S.C. § 2339D (Count Four) and obstruction of justice, in violation of 18 U.S.C. § 1512(b)(2) (Count Five).

The defendant arrived in the United States in FBI custody and was arraigned on the Complaint on July 19, 2019, before the Honorable Steven M. Gold and ordered detained. He has remained in custody since that date.  <u>See</u> PSR at 1.

II.     <u>TRIAL AND CONVICTION</u>

Following jury selection proceedings conducted in January 2023, trial began on January 23, 2023.  Over approximately nine trial days, the government presented testimony from 17 witnesses, including the defendant's former spouse; a cooperating witness and associate of Kandic's; and a confidential informant with whom Asainov spoke while he was

fighting in Syria.  The government also called multiple expert witnesses and a law enforcement witness to whom Asainov spoke following his arrest.  Additionally, multiple law enforcement personnel testified concerning various records, documents, and recordings establishing the defendant's conduct.

After a few hours of deliberation, the jury returned a verdict of guilty on each of the five counts charged.  See ECF No. 167.  As to Count Three, the jury found that the death of one or more persons resulted from the offense.  See id.

<u>LEGAL FRAMEWORK</u>

I.   <u>THE SENTENCING FRAMEWORK AND APPLICABLE GUIDELINES CALCULATIONS</u>

The defendant faces a sentence of up to life on Count Three, up to twenty years on Counts One, Two and Five, and ten years on Count Four.

The United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines"), while advisory, are still a strong source of guidance for sentencing courts following <u>Booker</u> and its progeny.  <u>See</u> <u>United States v. Booker</u>, 543 U.S. 220, 264 (2005) (holding that while the Guidelines are not mandatory, they remain in effect and must be "consult[ed]" and "take[n] into account" at sentencing).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" as the "starting point and the initial benchmark." <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007).

The Guidelines are accurately set out in the PSR.  <u>See</u> PSR ¶¶ 32-42.  Each of the counts of conviction is grouped together.  U.S.S.G. §§ 3D1.2-1.3.  Because one of the counts resulted in death, the applicable guideline is U.S.S.G. § 2A1.1 (First Degree Murder):

| | | |
|---|---|---|
| Base Offense Level / Offense Resulted in an Intentional Death (U.S.S.G. §§ 2M5.3(c)(1), 2A1.1)): | | 43 |
| Plus: | Offense Was A Felony Involving A Federal Crime of Terrorism (U.S.S.G. § 3A1.4(a)) | +12 |
| Plus: | Defendant Was Organizer/Leader of Extensive Criminal Activity Involving Five or More Participants (U.S.S.G. § 3B1.1(a)) | +4 |
| Plus: | Obstruction of Justice (U.S.S.G. § 3C1.1) | +2 |
| **Total:** | | **61** |

The defendant has not demonstrated any acceptance of responsibility for his conduct, so no adjustment under U.S.S.G. § 3E1.1 is warranted.  <u>See</u> PSR ¶ 41.  The adjusted

offense level of 61 is treated as offense level 43.  <u>See</u> Sentencing Table, Application Note 2; PSR ¶ 42.  Pursuant to U.S.S.G. § 3A1.4(a), the defendant's criminal history category is VI. PSR ¶ 45.

The corresponding Guidelines range is life imprisonment.  PSR ¶ 66.[3]

---

[3]     On August 16, 2023, the government submitted a letter to the assigned U.S. Probation Officer proposing minor corrections to the PSR, none of which affects the Guidelines calculation or affect the government's position as to the appropriate sentence.  A copy of the government's August 16 Letter will be filed contemporaneously with this memorandum under seal.  The defendant has not responded to the government's August 16 Letter.

II.     THE 3553(A) SENTENCING FACTORS

After calculating the Guidelines as the initial benchmark, the Court must consider the familiar sentencing factors of 18 U.S.C. § 3553(a) ("Section 3553(a) Factors" or "the Sentencing Factors"). These include "the nature and circumstances of the offense and the history and characteristics of the defendant," Section 3553(a)(1); "the kinds of sentences available," Section 3553(a)(3); the Guidelines range itself, Section 3553(a)(4); any relevant policy statement by the Sentencing Commission, Section 3553(a)(5); "the need to avoid unwarranted sentenced disparities among defendants," Section 3553(a)(6); "the need to provide restitution  to any victims," Section 3553(a)(7); and the need to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which include the following four objectives:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[s];
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the applicable Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Gall,

552 U.S. at 50 n.6.  Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the Sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives."  <u>Rita v. United States</u>, 551 U.S. 338, 348 (2007).  Should a court choose to vary from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  <u>Gall</u>, 552 U.S. at 50.

ARGUMENT

I.   THE COURT SHOULD IMPOSE THE MAXIMUM SENTENCE

Each of the applicable sentencing factors counsels in favor of the maximum possible sentence.  The record is replete with aggravating factors.  There appear to be no meaningful mitigating circumstances in the trial record or the PSR.  Accordingly, the Court should impose the maximum available sentence of life imprisonment plus 70 years.

A.   The Nature and Seriousness of the Defendant's Egregious Conduct Requires the Maximum Sentence

The defendant devoted years of his life to a violent global terrorist organization, one that proudly claimed responsibility for innumerable acts of violence and savagery in Syria, Iraq, and elsewhere against innocent civilians, including Americans.  The "nature and circumstances of the offense," Section 3553(a)(1), are therefore among the most egregious that could be conceived.  The defendant fought for years to promote ISIS's goals until the bitter end during ISIS's last stand in Baghouz, Syria.  His service as an ISIS sniper and sniper-trainer ended only because ISIS was losing its war and territorial control in Syria.  Even at the war's end, as his final act in support of ISIS, the defendant set his cell phone on fire before surrendering.  PSR ¶ 23.

Throughout his years as a member, sniper, and sniper-trainer of ISIS, the defendant reveled in the violence of ISIS's campaign.  As he stated to his co-conspirator Kandic while fighting in Raqqa, Syria, "Everything is good, *alhamdulilah akhy alhamdulilah*. They dying here, they dying.  [Laughter].  The numbers are good."  GX 1334TR.  When faced directly with the death of ISIS's enemies, the defendant laughed, showing a callous disregard for human life and the impact of ISIS's violence.

The defendant provided material support to ISIS by providing himself as a warrior and sniper, providing training and expert advice to nearly 100 students to become ISIS snipers, PSR ¶ 19, and providing military equipment, including a night vision scope, to ISIS. The defendant's actions resulted in the death of one or more persons.  When asked by law enforcement how many confirmed kills he had, the defendant said he could not recall.  Tr. 1445.  As the government highlighted in closing arguments, the defendant's statement can only be read as an admission that he has so many deaths on his hands that he has lost count. Regarding his students, the defendant stated: "My students may be killed and they did kill, and I taught them."  Tr. 1446.  The number of deaths attributable to his students cannot  be calculated.  The statute of conviction requires only one, but as the trial record made clear, the defendant was responsible—as both a shooter and a trainer—for far more than one death.

The defendant has been in custody in the United States for more than four years. The government is unaware of any instance in which he has shown an iota of remorse, doubt, or self-reflection on past mistakes.  To the contrary, he has doubled down on his conduct, stating to his mother, "Allah told me to kill and fight with them, that's it.  I executed what Allah order me to do."   GX 508A.  In sum, the "seriousness of the offense," Section 3553(a)(2)(A), and the corresponding need for a significant sentence, cannot be overstated.

B.    The Maximum Sentence Is Appropriate to Deter Others and to Protect the Public from Further Crimes of the Defendant

The maximum sentence is also necessary and appropriate "to afford adequate deterrence to criminal conduct."  Section 3553(a)(2)(B).  This is especially so in the context of terrorism offenses.  See, e.g., United States v. Stewart, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring) ("In no area can the need for adequate deterrence be greater than in

terrorism cases, with their potential for devastating loss of innocent life."). In this case, there is a strong demand for both individual and general deterrence.

The maximum possible sentence would also serve the purposes of sentencing because it would "protect the public from further crimes of the defendant." Section 3553(a)(2)(C). The defendant joined ISIS before it declared itself to be a caliphate. He played a key role in building it to the peak of its power as the deadliest terrorist organization in the world by fighting for ISIS as a sniper emir, training nearly 100 other ISIS fighters, and providing military equipment to ISIS.

The defendant's statements and conduct after his arrest in this case prove beyond any shadow of doubt that the defendant would return to supporting radical jihadist violence if given the opportunity. As he stated to his mother while incarcerated at the MDC, "I'm asking Allah day and night to erase this country from the face of the Earth. . . . and I won't stop mama until the sky will be closed with smoke. Do you understand? Until Allah will close it for you." GX 506A. He stated further, "I chose a path and I'm walking on this path. Do you understand? I will never change this path even if they give me freedom a thousand times." GX 510A.

There is no reason to conclude that the defendant will ever change. If given the opportunity, he will spend every day that remains to him pursuing jihadist violence. The maximum sentence available is therefore the necessary sentence.

C.    The Defendant's History and Characteristics Also Support the Maximum Possible Sentence

The defendant was born in Kazakhstan in June 1976. PSR ¶ 50. In 1998, the defendant was randomly selected for consideration for a United States visa through the U.S.

23

diversity visa program.  The defendant ultimately immigrated to the United States on February 27, 1999.  PSR ¶ 52.  After living in the United States for over seven years as a lawful permanent resident, in March 2006, the defendant applied for citizenship.  GX 307.  On his application for citizenship, he stated that he lived in Brooklyn and worked as a trader.  GX 307.  In his application, the defendant answered "yes" when asked if he was willing to take an oath of allegiance to the United States, and he signed his name under such an oath.  GX 307.  The defendant became a naturalized United States citizen on September 1, 2006.  PSR ¶ 52.

In the years that followed, the defendant married his former spouse, who he grew up with in Kazakhstan, and resided with her and their daughter in Brooklyn.  Tr. 798-99, 801, 806.  The defendant won a lottery when he was granted a visa, and ultimately citizenship, in the United States, but rather than continue to build his life here with his former spouse and child, the defendant abandoned his family and the country to which he gave an oath of allegiance to instead wage violent jihad in Syria.  And in the name of ISIS, he threatened his former spouse and the mother of his child.  GX 633T; GX 634T.

Not every terrorism case gives the jury or the Court such an intimate perspective on the defendant's history and characteristics.  But this trial did, casting a spotlight on the life and family that the defendant left behind when he sought blood, combat and jihadi glory in Syria.  The defendant's former spouse testified about their lives together.  In searing detail, she recounted for the jury how, even after the defendant abandoned her, she did her best to maintain at least some semblance of a relationship between the defendant and their child together.  The defendant's response was to threaten her with a violent execution by ISIS.  The Court received exhibits into evidence attesting to the defendant's intellect, in the form of the brokerage

examinations he sat for, and passed.  And the Court learned of the defendant's continued access to and aptitude for education.

Last but by no means least, the Court also heard—indirectly, via the recorded jail calls with the defendant's mother—that the defendant has at least one family member who, to this day, has not abandoned him in total and tries to maintain a relationship with him.

Wife, child, education, mother, family: the defendant had no shortage of sources of support, nor any shortage of people in whom to put his faith and love if he was unfulfilled with his life in the United States.  But his heart turned cold, overrun with contempt, hatred, and scorn.  What many would characterize as life's blessings, the defendant now dismisses as *kuffar*, infidel, worthy of violent death.  There is no reason to believe he will ever reconsider that view.  The defendant's personal history and characteristics, Section 3553(a)(1), therefore also counsel in favor of the maximum possible sentence.

D.     Comparable Sentences

A comparison to other similarly situated ISIS offenders and FTO offenders more generally reveals that a life sentence for the defendant's offense conduct is well within the norm for offenders with similarly egregious offense conduct.  And notably, the defendant's co-conspirator, Mirsad Kandic, recently received a sentence of life imprisonment.

- United States v. Kandic, No. 17-CR-449 (NGG), ECF No. 360, (E.D.N.Y. July 14, 2023) (life sentence on two counts, to run concurrently, and 240 months on the remaining counts, to run concurrently);

- United States v. Saipov, No. 17-CR-722 (VSB), ECF No. 810 (S.D.N.Y. June 27, 2023) (eight life sentences plus 260 years to run consecutively for ISIS member who used a truck to strike more than 20 people in lower Manhattan, killing eight victims);

- <u>United States v. El Sheikh</u>, No. 20-CR-239 (TSE), ECF No. 322 (E.D.Va. Aug. 19, 2022) (eight concurrent life sentences for ISIS member of the "Beatles" cell responsible for murders of multiple ISIS hostages, including American citizens);

- <u>United States v. Khalifa</u>, No. 21-CR-271 (TSE), ECF No. (E.D.Va. July 29, 2022) (life sentence for ISIS propagandist featured in the "Flames of War" video who executed prisoners of war in the making of that video);

- <u>United States v. Kotey</u>, No. 20-CR-239 (TSE), ECF No. 307 (E.D.Va. Apr. 29, 2022) (eight concurrent life sentences for ISIS member convicted of same offenses as in <u>El Sheikh</u>);

- <u>United States v. Ullah</u>, No. 18-CR-16 (RJS), ECF No. 114 (S.D.N.Y. Apr. 23, 2021) (three concurrent life sentences plus 30 years for bomber of New York City subway, who committed non-fatal attack in support of ISIS, in which multiple commuters were injured);

- <u>United States v. Medunjanin</u>, No. 10-CR-19 (BMC), ECF Nos. 515, 519 2020 WL 5912323, *9 (E.D.N.Y. Oct. 6, 2020) (imposing effective sentence of life—95 years—for various offenses committed in support of ISIS after life sentence for conviction under 18 U.S.C. § 924(c) was required to be vacated following <u>United States v. Davis</u>, 139 S. Ct. 2319 (2019), and noting: "In practice, there is no difference between 95 years' custody and life plus 95 years' custody. Defendant will not be released from prison during his lifetime under either sentence.");

- <u>United States v. Hausa</u> ("Spin Ghul"), No. 12-CR-134 (BMC), ECF No. 306 (E.D.N.Y. Feb. 26, 2018) (imposing multiple life sentences for a defendant who fought against U.S. troops on the battlefield and was convicted of conspiracies to murder U.S. nationals, bomb a government facility, provide material support to al-Qaeda, and other offenses).

E. <u>Supervised Release</u>

The defendant's convictions under 18 U.S.C. § 2339B are terrorism predicates for purposes of supervised release, enlarging the authorized supervise release term to life.  <u>See</u> 18 U.S.C. §§ 2332b(g)(5)(B), 3583(j); <u>cf.</u> PSR ¶¶ 67-69.  Although the government believes that any term of supervised release will be mooted in light of the defendant's term of incarceration, the government respectfully requests that the Court impose a term of supervised

release of life.  Such a lifetime term of supervised release, if not mooted by a life term of imprisonment, is amply justified by the defendant's statements, set forth in detail throughout this submission, of his intent to return to a lifetime of jihad if released from custody, including his statement that "I will be fighting until the end . . . Until I meet Allah."

        F.     <u>Financial Aspects of Sentencing</u>

The Court is required to impose a special assessment of $500.  PSR ¶ 73; 18 U.S.C. § 3013.

The defendant has not provided any information regarding his financial status, and therefore, the government has no information indicating that the defendant is unable to pay a fine.  PSR ¶ 72.

The government has been unable to reasonably determine the number of victims who died or suffered injuries as a result of the defendant's conduct, nor has the government been able to identify or contact family members of those victims.  Restitution is therefore not applicable in this case.  <u>See</u> PSR ¶ 29.

CONCLUSION

For the reasons set forth above, the government respectfully requests that the

Court impose a sentence of life imprisonment as to Count Three, to be followed

consecutively by a maximum term of twenty years as to each of Counts One, Two, and Five,

and a term of ten years as to Count Four, for an effective sentence of life plus 70 years, to be

followed by a supervised release term of life.

Dated:  Brooklyn, New York
    October 6, 2023

         Respectfully submitted,


         BREON PEACE
         UNITED STATES ATTORNEY
         Eastern District of New York


     By:     /s/
         Douglas M. Pravda
         J. Matthew Haggans
         Nicholas J. Moscow
         Nina C. Gupta
         Assistant United States Attorneys
         (718) 254-6268/6127/6212/6257

Cc:  Clerk of Court (NGG) (By Email and ECF)
   Susan Kellman and Sabrina Shroff, Esqs. (By Email and ECF)
   U.S. Probation Officer Jennifer E. Baumann (By Email)